## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

RICHARD DAVIS,                           )
                                         )
    Plaintiff,               )
                                         )
    vs.                      )    **Case number 4:09cv1707 TCM**
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
    Defendant.               )

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael

J. Astrue, the Commissioner of Social Security (Commissioner), denying Richard Davis'

applications for disability insurance benefits (DIB) under Title II of the Social Security Act

(the Act), 42 U.S.C. § 401-433, and social security income (SSI) under Title XVI of the Act,

42 U.S.C. § 1381-1383b.[1] Mr. Davis (Plaintiff) has filed a brief in support of his complaint;

the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB and SSI in January 2006, alleging he is disabled since

November 2004 by schizophrenia, depression, suicidal ideation, difficulties reading and

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of
the parties. See 28 U.S.C. § 636(c).

writing, left knee problems, and a deteriorating memory. (R.[2] at 69-76.) His applications[3] were denied initially and after a hearing held in January 2008 before Administrative Law Judge (ALJ) Thomas C. Muldoon. (Id. at 16-49.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness at the hearing.

Plaintiff testified that he was then 49 years old, 5 feet 11 inches tall, and weighed 240 pounds. (Id. at 30.) He lives with his brother in the house left them by their parents. (Id.) His current weight is not his usual weight. (Id. at 31.) Approximately two years ago, he gained 50 pounds from eating when he was stressed, frustrated, and depressed. (Id.) About the same time and for the same reason, he started smoking more and now smokes a pack of cigarettes every day or two. (Id.) He is divorced, and has been since 1997, and has no minor children. (Id.) He completed the twelfth grade. (Id.)

Plaintiff had worked in construction, doing such jobs as laying ceramic tile, installing drywall, and doing electrical and plumbing work. (Id. at 32.) He had to stop that work because his medication interfered with his ability to concentration and made it dangerous for him and others for him to do the work and use the equipment. (Id.) After that, he waited on

---

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

[3]A prior application for DIB was not pursued after its initial denial in August 1995. (Id. at 92.)

tables, did housekeeping, and stripped and waxed floors.  (<u>Id.</u> at 32, 33.)  He had to stop this work also because of his difficulties concentrating and because of two work-related injuries, one to his head and the other to his left shoulder.  (<u>Id.</u>)  He also had had knee surgery.  (<u>Id.</u> at 33.)  Sometimes, his knee goes out on him and his shoulder hurts.  (<u>Id.</u>)  He's been told he has arthritis.  (<u>Id.</u>)

Plaintiff takes Prozac for depression and sometimes takes Trazodone to help him sleep.  (<u>Id.</u> at 33, 34, 39.)

He works part-time at his church doing cleaning work.  (<u>Id.</u> at 33.)  He was offered this job by someone he met when he was in a drug treatment program.  (<u>Id.</u>)  He started the job in December 2006, and works three or four hours a day, five days a week.  (<u>Id.</u> at 34, 35.)  The woman he works for is flexible about when he starts work so he can take his medication at the necessary time.  (<u>Id.</u> at 34.)  She has asked him, however, to try to be there at the regular starting time and to stay focused.  (<u>Id.</u> at 35.)  He still has a problem doing either.  (<u>Id.</u> at 35-36.)

Plaintiff's sister takes him to work or he uses the bus.  (<u>Id.</u> at 36.)  His driver's license was suspended after he did not report an accident he had.  (<u>Id.</u> at 36-37.)  Also, his doctors have recommended that he not drive because his medication interferes with his ability to focus.  (<u>Id.</u> at 37.)

Plaintiff has not used drugs or drunk alcohol since completing a rehabilitation program two years earlier.  (<u>Id.</u> at 37-38.)  He attends follow-up meetings.  (<u>Id.</u> at 38.)  His doctor, Dr. Krojanker, wants him to attend "Emotional Anonymous" meetings because of his

difficulties with relationships.  (Id. at 38-39.)  He has no idea what the group is about.  (Id. at 38.)

Plaintiff described his depression as "not good some days."  (Id. at 39.)  He has been hospitalized for suicidal thoughts.  (Id.)  He has cut his wrists and tried to overdose on pills. (Id. at 40.)  Since he has been clean and sober, he has not acted on the suicidal thoughts he has.  (Id.)  He talks about them with Dr. Krojanker.  (Id.)  He still has difficulties concentrating and focusing.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and assessments by examining and non-examining consultants.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 95-102.)  He reported that he is 6 feet tall and weighs 200 pounds.  (Id. at 95.)  His impairments limit his ability to work because he is always thinking about hurting himself, is drowsy because of his medication, is depressed, cannot lift or carry anything, and cannot read, write, or remember.  (Id. at 96.)  His impairments first bothered him in the 1980s and prevented him from working on November 1, 2004, when his worsening condition finally became so bad he could no longer work.  (Id.)  The job he had held the longest was doing housekeeping.  (Id. at 97.)  This job required that he walk eight hours a day and climb, stoop, kneel, crouch, crawl, and reach for one hour each.  (Id.)  For one hour, he also had to handle, grab, or grasp big objects and write, type, or handle small objects.  (Id.)  The heaviest weight

- 4 -

he had had to lift was 100 pounds or more.  (Id. at 98.)  The weight he usually lifted was fifty to sixty pounds.  (Id.)  He supervised ten people.  (Id.)  He takes Prozac and Trazodone for depression; both make him drowsy.  (Id. at 100.)  He graduated from high school in 1978, and had not been in special education classes.  (Id. at 101.)  He had taken three years of high-school level special education classes when in a correctional facility.  (Id.)

Plaintiff's sister completed a Function Report on his behalf.  (Id. at 103-19.)  Asked to describe what he did during the day, she reported that he takes care of his personal needs, with help, eats, walks, and watches television.  (Id. at 103.)  Before his illnesses, he was able to work.  (Id. at 104.)  His illnesses make his sleep restless and broken.  (Id.)  He needs to be reminded to take care of his personal needs and to take his medicine.  (Id. at 105.)  He does not prepare meals because his forgetfulness might cause the kitchen to catch fire.  (Id.)  He does not do any house or yard work because he is unstable.  (Id. at 105-06.)  He does not drive because he is unstable.  (Id. at 106.)  He shops once a month for food for varying lengths of time.  (Id.)  His only hobby or interest is watching television.  (Id. at 107.)  He can do so for only thirty minutes because he cannot sit still for any longer.  (Id.)  He attends church with other people twice a month.  (Id.)  His impairments affect his abilities to lift, remember, complete tasks, concentrate, understand, and follow instructions.  (Id. at 108.)  He cannot lift more than ten pounds, cannot understand or remember well, cannot follow instructions well, and cannot complete a task.  (Id.)  He cannot walk for longer than thirty minutes without having to stop and rest for two minutes.  (Id.)  He can pay attention for only

a few minutes.  (Id.)  He is withdrawn, but gets along okay with authority figures because everybody is the same to him.  (Id. at 109.)

After the initial denial of his applications, Plaintiff completed a Disability Report – Appeal questionnaire.  (Id. at 123-28.)  Since completing the first report, he had almost cut off four of his fingers doing work around the house; also, his nerves, knee, and shoulder were "bad" and continually getting worse  (Id. at 124.)  His brother helps him a lot.  (Id. at 126.) His memory "comes and goes."  (Id.)  He tries to be responsible for himself, but cannot really do anything because he is too drowsy half the time.  (Id.)  He had just been approved for Medicaid[4] and was going to try to see a doctor.  (Id. at 127.)

On a separate form, Plaintiff reported that he had recently been diagnosed with prolonged posttraumatic stress disorder and major depressive affective disorder. (Id. at 129.)

An earnings report generated for Plaintiff pursuant to his applications lists earnings for 1973, 1977 through 2004, inclusive, and 2006.  (Id. at 78.)  His annual earnings in 1973, 1977, and 2006 were less that $650.00.  (Id.)  In the remaining twenty-seven years, his earnings were between $15,000 and $20,000 in five years; between $10,000 and $15,000 in nine years; and between $5,000 and $10,000 in eleven years.  (Id.)  In one of the two remaining years, 1992, his annual earnings were $3,398.09; in the other year, 1988, they were $20,952.47.  (Id.)

---

[4]Plaintiff was been approved for Medicaid following a hearing held in January 2006 before the Missouri Department of Social Services.  (Id. at132-37.)  He was found to have a severe, anti-social personality disorder that, combined with his advanced age, precluded him from performing his past relevant work or any other substantial gainful activity.  (Id. at 136.)

The relevant medical records before the ALJ are summarized below in chronological order.

Plaintiff was diagnosed in 1996 with cocaine and marijuana dependence when he was voluntarily admitted to Malcolm Bliss Mental Health Center after overdosing on Tylenol, aspirin, and Norgesic (a medication including aspirin). (Id. at 191-93.) He was not started on any antidepressants as there was no identifiable major affective disorder to be treated. (Id. at 192.) His Global Assessment of Functioning score was 60 to 70.[5] (Id.)

Plaintiff was admitted to Forest Park Hospital (FPH) in September 2003 after expressing suicidal ideation. (Id. at 144-52.) He did not feel like he was a good father to his two children (ages 18 and 26), had no car (his had been repossessed a week earlier), had had no job for the past year, and had been told by the IRS that he owed more than $6,000 for nonpayment of taxes for thirteen years. (Id. at 145.) He was living with his brother but was afraid his brother would kick him out soon. (Id. at 147.) It was noted that he had been sniffing paint and using crack cocaine. (Id. at 150.) "His mood was very depressed"; his "affect was rather blunted." (Id. at 148.) His speech was clear and coherent; his recent and

_____

[5]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id. (emphasis omitted).

remote memory was good, as were his attention span and concentration. (Id.) He "appeared to have a great level of intelligence." (Id.) His "[i]nsight and judgment appeared fair." (Id.) He was "started on suicidal precautions," given medication for depression, and given counseling. (Id. at 146, 149.) Three days later, the suicidal precautions were stopped. (Id.) He asked to be, and was, discharged the next day. (Id. at 146.) "He did not appear suicidal." (Id.) He stated that he would followup at the Hopewell Center (Hopewell). (Id.)

The following month, Plaintiff was admitted to St. Alexius Hospital (St. Alexius) after he heard voices, thought of cutting himself, and was again using cocaine. (Id. at 200-33.) He reported that the new medicine he had been placed on made his muscles cramp so he had stopped taking it. (Id. at 206.) He had become increasingly depressed since being released from FPH and had decreased interest in daily activities, poor concentration, and feelings of worthlessness, hopelessness, and despondency. (Id.) He had no physical complaints. (Id.) On examination, he was "somewhat paranoid, guarded, suspicious." (Id. at 207.) He was alert and oriented to person and place but not to date. (Id.) He appeared to be of average intelligence. (Id.) His insight and judgment were guarded. (Id.) Plaintiff was placed on alcohol detoxification, given medication, and provided therapy. (Id. at 211.) He was discharged six days later with a diagnosis of schizoaffective disorder and cocaine abuse. (Id. at 200, 201, 211.)

Plaintiff was again admitted to St. Alexius after going to the emergency room in June 2004 with complaints of chest pain and reports of feeling suicidal. (Id. at 235-48.) He had been abusing cocaine and heroin. (Id. at 236.) He was restless and not sleeping well. (Id.

at 238.)  He was not on any psychotropic medication.  (Id.)  A chest x-ray was normal.  (Id.

at 242.)  After going through a detoxification program, he was discharged six days later.  (Id.

at 236.)  His GAF at time of admission was 35[6]; at time of discharge, it was 60.[7]  (Id. at 237,

239.)  It was recommended that he continue with Narcotics Anonymous and Alcoholics

Anonymous meetings.  (Id. at 237.)

In 2005, Plaintiff was hospitalized for twelve days in May at St. Alexius.  (Id. at 249-

67.)  He reported that he was hearing voices telling him to hurt himself and was feeling

depressed, hopeless, helpless, and worthless.  (Id. at 252, 254.)  He had been using crack

cocaine.  (Id.)  He was homeless and unemployed.  (Id. at 252, 255.)  His insight and

judgment were poor; his intelligence was average.  (Id. at 255.)  An x-ray of his left shoulder,

taken due to complaints of pain, showed "[s]ome thinning of the distal clavicle" and

"[p]robably old small avulsion adjacent to the coracoid process."  (Id. at 262.)  He was

admitted to the acute inpatient psychiatric unit and treated with individual and group

psychotherapy, psychotropic medication, medication and diagnostic education, stress and

anger management therapy, relaxation and activity therapy, reality orientation therapy, and

chemical dependency rehabilitation education.  (Id. at 252.)  There were no side effects of

the medication.  (Id.)  On discharge, Plaintiff reported feeling a lot better.  (Id. at 251, 252.)

The discharge diagnosis was mood disorder due to drug use and cocaine dependence.  (Id.

---

[6]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).

[7]See note 5, supra.

at 252.)  He was to followup with the psychiatrists at Hopewell and was given prescriptions for Paxil and Trazodone.  (Id. at 252.)

Four months later, Plaintiff was hospitalized again at St. Alexius after "claiming to be suicidal and threatening to walk in front of a car."  (Id. at 268-95.)  A urine screen was positive for cocaine.  (Id. at 271.)  He was described as claiming to be, but not appearing to be, suicidal.  (Id. at 271.)  He reported having a happy childhood.  (Id. at 273.)  He was "generally pleasant and cooperative" and "rather glib."  (Id. at 274.)  The flow and content of his thought were unremarkable.  (Id.)  His mood was euthymic; his affect was shallow. (Id.)  When he talked about walking in front of a car, "there was no seriousness in his tone of voice."  (Id.)  He "was inconsistent and the [sic] voracity of his statements was quite questionable."  (Id.)  He was also inconsistent about hearing voices.  (Id.)  His intellect and memory appeared to be normal.  (Id.)  His insight and judgment were fair.  (Id.)  The psychiatrist, Jeffrey Pevnick, M.D., described Plaintiff as "manipulative" and reported that Plaintiff had stated that he had a good job and would pay for his hospitalization.  (Id. at 275.) During his hospitalization, he was anergic, laying in bed, eating and sleeping well, and gaining weight.  (Id. at 271.)  He complained of depression, and was given two medications, Prozac and Remeron.   (Id.)   "There were no significant medical problems."  (Id.)  A consulting physician, Robert C. Egan, M.D., noted that Plaintiff's hidradenitis suppurative (a chronic skin inflammation[8]) had subsided "somewhat" and Plaintiff was disinclined to

---

[8]See Mayo Clinic, Hidradenitis suppurativa, http://www.mayoclinic.com/health/ hidradenitis-suppurativa/DS00818 (last visited Mar. 24, 2011).

have any surgical care. (Id. at 276.) During the course of his hospitalization, Plaintiff gradually improved, was less depressed, and, fourteen days later, said he wanted to leave and get back to work. (Id. at 271.) He asked for help in obtaining the medications, but the hospital declined on the grounds that they were both generic and he should be able to afford them since he was able to work. (Id.) He was given one month's supply. (Id.) His diagnosis on discharge was polysubstance dependence; depression, not otherwise specified; and antisocial personality disorder. (Id. at 271-72.) His GAF was 50.[9] (Id. at 272.) At Plaintiff's request, the psychiatrist gave him a note for work excusing him for his stay in the hospital and stating that, at the time of discharge, he was not psychotic or suicidal. (Id.)

Plaintiff was admitted again to FPH on October 15 after becoming depressed and taking an overdose of ibuprofen and pain medication. (Id. at 153-66.) He had cocaine in his system. (Id. at 158.) It was noted that he had started using drugs again after being released from St. Alexius Hospital. (Id. at 154.) He was usually noncompliant with his medication. (Id.) He reported feeling hopeless and helpless and hearing auditory hallucinations. (Id.) He was homeless and unemployed. (Id. at 155.) His mood and affect were depressed. (Id.) His eye contact was fair. (Id.) He was cooperative and alert and oriented to time, place, and person. (Id.) His judgment and insight were poor, but he had no tangentiality, circumstantiality, or flight of ideas. (Id.) He had auditory hallucinations

---

[9]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

and was of an average intelligence. (<u>Id.</u>) He was discharged two days later when he no longer was a danger to himself. (<u>Id.</u> at 153, 156.)

Plaintiff was seen on March 23, 2006, at the Hopewell for evaluation and resumption and continuation of psychiatric care. (<u>Id.</u> at 169-89.) Plaintiff reported that he had a twelfth grade education with a history of special education and diagnosis of learning disabled. (<u>Id.</u> at 182.) He also had a diagnosis of depression. (<u>Id.</u>) He had been sober for four and one-half months. (<u>Id.</u> at 182, 184.) He also reported that he had been admitted to hospitals for depression at last twenty-five times during the same number of years. (<u>Id.</u> at 182.) He had been depressed all his life. (<u>Id.</u> at 173.) His last suicide attempt was two weeks earlier. (<u>Id.</u>) He had run out of his medications, Lexapro and low dose Seroquel, and was feeling increasingly edgy, jumpy, irritable, sad, and angry. (<u>Id.</u> at 182.) His concentration, energy, sleep, and appetite were poor. (<u>Id.</u>) He would hear voices, especially when using cocaine, but had heard none for several weeks. (<u>Id.</u> at 183.) Other unusual experiences, e.g., thinking the radio talked to him, were when he was using drugs. (<u>Id.</u>) He reported seeing people who were not here, feeling them touching him, and hearing them laugh at him. (<u>Id.</u> at 187.) He felt claustrophobic. (<u>Id.</u>) He thought people wanted to hurt him. (<u>Id.</u> at 183.) He avoided being around people, including family. (<u>Id.</u> at 187.) His daughter helped him with his finances. (<u>Id.</u> at 176.) He felt hopeless, guilty, and ashamed. (<u>Id.</u> at 173.) He slept badly. (<u>Id.</u>) His appetite was erratic, and he had gained weight since stopping using drugs. (<u>Id.</u>) He had been sexually abused when he was 13 by a friend of his mother. (<u>Id.</u> at 183, 184.) He had not told anyone. (<u>Id.</u> at 184.) His symptoms were described as being consistent with

post-traumatic stress disorder.  (Id.)  It was noted that he had a history of poor compliance with medication.  (Id. at 170, 173, 188.)  He reported that his depression was manageable when he was an inpatient and on medication.  (Id. at 173.)  On examination, his thought process was sequential, logical, and goal-directed; his thought content lacked suicidal or homicidal ideation.  (Id. at 176, 184.)  He had significant paranoia and intermittent auditory hallucinations, "the latter more so in the context with substance abuse."  (Id. at 184.)  His mood and affect were sad, tearful, and hopeless.  (Id. at 177.)  His memory was found to be good, although Plaintiff reported that his memory was poor; his concentration was poor.  (Id. at 177, 184.)  He had a hard time with spelling or simple mathematical questions.  (Id. at 184.)  "His abstraction skills were fair," as were his insight and judgment.  (Id. at 177, 184.)  His intelligence quotient (IQ) appeared to be in the low average to average range.  (Id. at 184.)  He was diagnosed with major depressive disorder, recurrent, with psychotic features; post-traumatic stress disorder; polysubstance dependence, in early remission; and antisocial personality disorder.  (Id. at 185.)  His GAF was 48.[10]  (Id.)  He was started on Prozac and Trazodone and was to followup with various supportive programs, e.g., a recovery program.  (Id. at 185-86.)

Plaintiff did not appear for his May 18 appointment due to a court date, but returned to Hopewell as a walk-in on May 22.  (Id. at 306.)  He planned on working as a painter.  (Id.)  He was continuing to be compliant with his medication.  (Id.)  He described his mood as stable and his sleep and appetite as normal.  (Id.)

---

[10]See note 9, supra.

Plaintiff saw a case worker at Hopewell on June 21.  (Id. at 309.)  He was neatly groomed, alert, oriented, and coherent.  (Id.)  His mood was reserved; his affect was congruent.  (Id.)

On July 20 and again on September 24, Plaintiff was again described as neatly groomed, alert, oriented, cooperative, and with a pleasant mood.  (Id. at 310, 311.)

On November 17, Plaintiff was described by Krojanker, Rolf, M.D., a psychiatrist with Hopewell, as continuing to recover and as being compliant with his medication.  (Id. at 303.)  He was to return in six months.  (Id.)

Plaintiff saw Dr. Krojanker again on January 12, 2007.  (Id. at 304.)  He reported that he had not used illegal drugs for more than fourteen months.  (Id.)  He was given a prescription for Prozac and Trazodone and diagnosed with history of cocaine abuse, prolonged post-traumatic stress disorder, and major depressive affective disorder.  (Id.)  His current GAF was 33[11] and had been for the past year.  (Id.)  He reported to his case worker that his mood was stable and he was sleeping well.  (Id. at 314.)

On March 9, Dr. Krojanker reported that Plaintiff was groomed, dressed within normal limits, and attempting to resolve his traffic ticket and warrant issues.  (Id. at 305.)  Plaintiff told his case worker that he was feeling very stressed due to several tickets.  (Id. at 315.)  He remained sober.  (Id.)  He was alert, oriented, and talkative and had a pleasant mood.  (Id.)

---

[11]See note 6, supra.

On May 4, his case worker noted that Plaintiff had a history of poor compliance with treatment for his depression until November 2005. (Id. at 318-21.) He was neatly groomed, alert, and oriented. (Id. at 319.) His thoughts were coherent; his mood and affect were cooperative and, at times, frustrated. (Id.)

In October, Plaintiff reported to his case worker that he was stressed about his disability claim and health. (Id. at 322.) He was alert, cooperative, and appropriately groomed. (Id.) His affect was blunted; his judgment and insight were good; his thought was coherent and goal-directed. (Id.) His sleep was okay; his appetite was decreased. (Id.)

In December, Dr. Krojanker described Plaintiff as groomed, dressed within normal limits, and "somewhat constricted." (Id. at 325.) He urged Plaintiff to go to emotions anonymous and gave him their phone number. (Id.) Plaintiff reported that he had arthritis and tried to exercise as much as possible. (Id.) He was sleeping okay with use of the Trazodone and was given a prescription for Prozac to be taken in the morning. (Id.) He was to return in four months for refills of his prescription. (Id.)

Also before the ALJ was an assessment of Plaintiff's mental residual functional capacity.

In May 2006, pursuant to his applications, Plaintiff underwent a psychiatric evaluation by John S. Rabun, M.D. (Id. at 299-301.) His chief complaint was of depression for the past twenty years. (Id. at 299.) Each episode could last several months. (Id.) When he was depressed, he thought of suicide, had no energy, reduced appetite, less sleep, crying spells, loss of pleasure, and social withdrawal. (Id.) On examination, he had a restricted affect,

difficulty concentrating, decreased psychomotor activity, and a negative outlook. (Id.) He could not recite the months of the year in reverse order, but his flow of thought was logical, sequential, and goal-directed. (Id. at 300.) His speech lacked spontaneity; his affect was restricted; his intellect was in the low average range; his insight and judgment were preserved. (Id.) The diagnosis was major depressive disorder, recurrent, and of moderate severity. (Id.) His current GAF was 50.[12] (Id.)

Dr. Rabun concluded that Plaintiff would not be able to focus, concentrate, and remember detailed instructions. (Id.) He would have mild to moderate limitations in his ability to understand and remember simple instructions, mild impairments in his ability to understand and remember simple instructions, and mild impairments in his ability to interact appropriately in a social setting and adapt to changes in a work environment. (Id. at 300-01.)

**The ALJ's Decision**

The ALJ determined that Plaintiff met the insured status through at least December 31, 2009, and had not engaged in substantial gainful activity since his alleged disability onset date of November 1, 2004. (Id. at 21.) He had severe impairments of major depressive disorder, post-traumatic stress disorder, and antisocial personality disorder. (Id.) Although he had a history of alcohol and drug abuse, this abuse had not been severe for twelve continuous months since he had been treated in the fall of 2005. (Id. at 22.) He also had a history of left shoulder surgery, but his claim of weakness in the shoulder was unpersuasive

_____

[12]See note 9, supra.

given his lack of treatment for it. (Id.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id.)

The ALJ summarized the notes from the Hopewell Center, including a reference by Dr. Krojanker to Plaintiff's success at his job, and the report of Dr. Rabun. (Id. at 22-23.) He concluded that Plaintiff's mental impairments resulted in mild restrictions of activities of daily life; mild difficulties in maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace on detailed instructions; mild difficulties maintaining concentration, persistence, or pace on simple instructions; and one episode of decompensation of extended duration. (Id. at 23.) The scope of his restrictions and difficulties did not satisfy the necessary listing criteria. (Id.)

Addressing the question of Plaintiff's residual functional capacity, the ALJ found that he could perform simple repetitive work. (Id. at 24.) In so finding, the ALJ emphasized Plaintiff's ability to maintain a part-time job, his stable living environment, his ability to take care of his own needs, make his own purchases, and attend church. (Id.) The ALJ further noted that no treating source had opined that Plaintiff could not maintain full-time employment and found that Dr. Krojanker's GAF scores were inconsistent with the progress notes of the Hopewell Center social workers, who had seen Plaintiff more frequently. (Id.) The ALJ also gave more weight to Dr. Rabun's narrative statements describing the extent of Plaintiff's functional limitations, e.g., mild impairments in social interaction, than to his GAF score. (Id. at 25.) Additionally, the ALJ gave weight to the opinion of the non-examining

consultant, Dr. DeVore,[13] that Plaintiff could perform work that is simple and repetitive in nature and no weight to the findings of the Missouri Department of Social Services that Plaintiff was disabled for purposes of Medicaid. (Id.)

With his RFC, the ALJ concluded, Plaintiff could perform his past relevant work as a housekeeping cleaner. (Id.) He was not, therefore, disabled within the meaning of the Act. (Id.)

## Additional Records Before the Appeals Council

After the ALJ entered his decision, Dr. Krojanker completed a mental residual functional capacity questionnaire on behalf of Plaintiff. (Id. at 328-32.) In this questionnaire, completed in August 2008 and submitted to the Appeals Council, he reported that Plaintiff had a major depressive affective disorder and post-traumatic stress disorder. (Id. at 328.) Plaintiff took Prozac and Trazodone, and had not reported side effects of either. (Id.) He had serious limitations, but not preclusive ones, in all sixteen listed mental abilities and aptitudes needed to do unskilled work and in all five of the listed mental abilities and aptitudes needed to do particular types of jobs. (Id. at 330, 331.) He was "unable to meet competitive standards" in three of the four listed mental abilities and aptitudes needed to do semiskilled and skilled work. (Id. at 331.) He would miss an average of two days a month

---

[13]Dr. DeVore's name appears once in the record. Specifically, his typed signature appears on the form Disability Determination and Transmittal. (Id. at 42.) It does not appear on the next page, even in typed form, that includes a conclusion that Plaintiff "has the mental residual functional capacity to perform work that is simple and repetitive in nature." (Id. at 43.) The only signature on that page, also in typed form, is that of the agency counselor.

due to his impairments or treatment.  (Id. at 332.)  And, his impairments were expected to last twelve months.  (Id. at 332.)  He rated Plaintiff's GAF as 40.[14]  (Id.)

Other medical records dated after the ALJ's decision were before the Appeals Council and are summarized as follows.

A magnetic resonance imaging (MRI) of Plaintiff's left knee taken on April 3, 2008, showed a tear of the posterior horn of the lateral meniscus; suprapatellar effusion; subchondral body bruising, medial tibial plateau; moderate to severe chondromalacia, lateral femoral tibial, and patellofemoral joints; and moderate to severe osteoarthritis in his femoral tibial joint.  (Id. at 326-27.)

Plaintiff reported to Dr. Krojanker on April 30 that he was depressed and frustrated with his situation, including the denial of his social security claim, but was otherwise okay. (Id. at 333-35.)  He had been working for his church part-time and was receiving food stamps.  (Id.)  On examination, he appeared tired, groomed, and dressed within normal limits.  (Id.)  He was worried about his finances.  (Id.)

Plaintiff saw an orthopedist at St. Louis ConnectCare on July 23, reporting that his left knee and back were painful.  (Id. at 336.)  He was given an injection in the knee and was to return in three months.  (Id.)

Plaintiff next saw Dr. Krojanker in August.  (Id. at 349.)  He was groomed and casually dressed; his memory was getting poorer.  (Id.)  He did not feel like working and was

---

[14]See note 6, supra.

angry, frustrated, moody, and snapping at people.  (Id.)  In addition to the Prozac and Trazodone, he was prescribed Seroquel, to be taken after supper and for insomnia.  (Id.)

In November, Plaintiff consulted a nurse practitioner, Gabrielle King-Satterfield, at Comprehensive Health Center, about his right knee pain.  (Id. at 338-39.)  On examination, his knee was not swollen, deformed, dislocated, or tender.  (Id. at 339.)  There was no pain on motion, which was normal, or muscle weakness.  (Id.)  His gait was steady.  (Id.)  The diagnosis was recurrent, intermittent right knee pain.  (Id.)  He was to follow up in three weeks with Dr. Cometa.  (Id.)

That same day, Plaintiff told Dr. Krojanker that he was depressed because he had just heard that right knee surgery would not help.  (Id. at 347-48.)

Plaintiff did see Teresita Cometa, M.D., on February 3, 2009.  (Id. at 340-42.)  He reported that he had been told by an orthopedist that there was nothing further that could be done.  (Id. at 340.)  He was encouraged to diet and exercise.  (Id. at 341.)

Two weeks later, Plaintiff consulted Laila Gabrawy, M.D., at Comprehensive Health Center about his blurry vision.  (Id. at 343-46.)  He was given a prescription for glasses and told to follow-up in one year.  (Id. at 346.)

He later told his case manager at Hopewell that he had been told by his employer that he would have to stop working by the end of the month due to his inconsistent attendance.  (Id. at 350.)  Also, the brother he lived with had started "using."  (Id.)

The Appeals Council considered Dr. Krojanker's questionnaire responses and the additional medical records, but found they did not provide a basis for changing the ALJ's decision.

## **Legal Standards**

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe

impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577,

581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Id.** (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions

represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the adverse decision is not supported by substantial evidence on the record as a whole because the ALJ (a) improperly assessed his RFC and (b) did not make the required function-by-function analysis of his past relevant work. The Commissioner disagrees.

As noted above, Plaintiff has the burden at step four of establishing his RFC. See **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010); **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004). On the other hand, the ALJ has the responsibility of assessing that RFC based on all the relevant evidence, including "at least some supporting [medical] evidence from a professional." **Id.** at 738. In his first argument, Plaintiff contends that the ALJ did not fulfill his responsibility because he gave too little weight to the favorable medical assessment of Dr. Krojanker, his treating psychiatrist, and to the GAF scores reflecting serious, job-precluding impairments.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord

**Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). There are six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "any factors [the claimant] bring[s] to [the ALJ's] attention" and "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

Dr. Krojanker was Plaintiff's treating psychiatrist. His records before the ALJ[15] begin with a first visit in November 2006 and end with the fourth visit in December 2007. At his second visit, Dr. Krojanker rated his GAF as 33, unchanged from the last year and indicative of a major impairment in several areas, including working. Dr. Rabun evaluated Plaintiff once. He rated his GAF as 50, indicative of a serious impairment in such functioning as occupational. Dr. Rabun also assessed Plaintiff as having, at worst, mild to moderate limitations in his ability to understand and remember simple instructions. The ALJ found Dr. Krojanker's GAF score to be inconsistent with the case workers's notes and unsupported. The case workers consistently described Plaintiff as being neatly groomed, alert, pleasant, and oriented. (See, e.g. R. at 306-15, 318-22. ) At the last of these sessions, in May 2007,

---

[15]Having reviewed Dr. Krojanker's records before the ALJ several times, the Court could find no reference in them to Plaintiff's success on the job, as noted by the ALJ in his decision. Also, the Court notes that Dr. Krojanker's assessment of Plaintiff's work-related limitations was before the Appeals Council, not the ALJ.

Plaintiff's GAF was reportedly a 48. During the relevant time period, the highest GAF rating given Plaintiff was a 60, and this was after a six-day psychiatric hospitalization.

"[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." **Jones**, 619 F.3d at 974 (internal quotations omitted). Moreover, "the Commissioner has declined to endorse the [Global Assessment Functioning] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [Global Assessment Functioning] scores have no direct correlation to the severity requirements of the mental disorders listings." **Id.** at 973-74 (alterations in original). In the instant case, however, Plaintiff's consistently low GAF scores from all sources, including the Commissioner's own consultant and the case workers cited by the ALJ, support Dr. Krojanker's assessment. Moreover, those low GAF scores are consistent with other portions of the record, including his record of psychiatric hospitalizations and his continuing need of psychotropic medication. See **Pate-Fires v. Astrue**, 564 F.3d 935, 944-45 (8th Cir. 2009) (remanding for further proceedings case in which ALJ failed to discuss or consider history of low GAF scores of claimant who, due to her mental illness, could not handle stress, had poor medication compliance, and was unable to stay focused). Cf. **Halverson**, 600 F.3d at 931 (finding that ALJ properly declined to give controlling weight to *one* GAF score of 40 that was inconsistent with other evidence); **Goff v. Barnhart**, 421 F.3d 785, 791 (8th Cir. 2005) (conversely, finding that ALJ properly declined to give controlling treating psychiatrist's opinion describing extreme limitations that was inconsistent with his GAF score of 58).

As noted by the Eighth Circuit in **Brueggemann v. Barnhart**, 348 F.3d 689, 695 (8th Cir. 2003), a GAF of 50 "reflects serious limitations in the patient's ability to perform basic tasks of daily life . . . ."  In rejecting the various medical sources' GAF findings, the ALJ expressly emphasized that Plaintiff could maintain a part-time job, had a stable living environment, could take care of his own needs, and make his own purchases.  The evidence before the ALJ was that Plaintiff had a part-time job because of the largesse of a woman he met at a drug treatment program who did not require that he maintain a regular schedule.  Later evidence shows that he lost that job because of his inconsistent attendance.  His sister reported, without contradiction, that Plaintiff did no housework or cooking because he was unstable and Dr. Krojanker observed that Plaintiff depended on his brother and sister to care for him.  There is a reference in the record to him being homeless at one point.  The ALJ also noted that Plaintiff made purchases and attended church.  The ability to shop once a  month and attend church twice a month does not lessen the severity of Plaintiff's mental impairment.

The ALJ further stated that he was giving weight to Dr. DeVore's opinion that Plaintiff had the ability to perform work that is simple and repetitive in nature.  As noted above, however, that was the opinion of a non-examining, non-medical agency counselor and is not entitled to the weight given it.  See **Dewey v. Astrue**, 509 F.3d 447, 449 (8th Cir. 2007).

For the foregoing reasons, the Court finds that the ALJ erred in his weighing of the various assessments of Plaintiff's mental capabilities.  The case shall be remanded for further development of the record on Plaintiff's mental capabilities and limitations.  See **Vossen**, 612

F.3d at 1016 (requiring that an ALJ seek additional clarifying statements from a treating physician if a crucial issue is undeveloped).

Plaintiff also argues that the ALJ failed to make the analysis required by **Pfitzner v. Apfel**, 169 F.3d 566, 568 (8th Cir. 1999), of the specific functions of a housekeeping cleaner. The Commissioner counters that the ALJ's findings that Plaintiff's past work as a housekeeping cleaner was unskilled work that involved simple, repetitive tasks and that Plaintiff retained the RFC to do such tasks satisfies this burden. Given that the case must be remanded for the reasons set forth above, the Court declines to reach this argument.

### Conclusion

Plaintiff might well not be disabled within the meaning of the Act. For the foregoing reasons, however, the ALJ's decision that Plaintiff is not is not supported by substantial evidence on the record as a whole. Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is REVERSED and the case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings as set forth above.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  28th  day of March, 2011.